UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JENNIFER M. LAMARCA,                                        **REPORT and**
                                                            **RECOMMENDATION**
                          Plaintiff,

v.                                                          13-CV-00970-WMS-JJM

THE CITY OF NIAGARA FALLS, NEW YORK
and THE CITY OF NIAGARA FALLS POLICE
DEPARTMENT,

                          Defendants.

_____

This case has been referred to me by Hon. William M. Skretny for supervision of

pretrial proceedings, including the preparation of a Report and Recommendation on dispositive

motions [30].[1] Plaintiff, Jennifer LaMarca, commenced this action against the defendants City of

Niagara Falls, New York ("City") and Niagara Falls Police Department ("NFPD")  alleging

"claims under Title VII [of the Civil Rights Act of 1964] and the [New York State Human Rights

Law ("NYSHRL"), NY Exec. Law §290, *et seq*.] for discrimination based on gender due to

being sexually harassed by Detective [Carlton] Cain" and "for unlawful retaliation" (plaintiff's

Memorandum of Law [40], pp. 4, 7), arising from her removal as a candidate for an entry-level

police officer position with the NFPD after she complained of the sexual harassment on

August 12, 2009. *See* Amended Complaint [1], pp. 23-37 of 40.

Before me is defendants' motion for summary judgment [22].  Oral argument was

held on June 22, 2015 [44].  For the following reasons, I recommend that the motion be granted

in part and denied in part.

_____

[1]        Bracketed references to CM/ECF docket entries.

## BACKGROUND

Plaintiff was placed on the Civil Service eligible list for the position of a police officer with the NFPD. Defendants' Amended Statement of Undisputed Facts [29], ¶¶1, 4-5. Before entering the Niagara County Law Enforcement Academy ("Academy"), where Detective Cain served as the Co-Director, candidates were required to complete several steps in the hiring process. Cain Declaration [22-1], ¶3.

Among these steps, plaintiff participated in a physical fitness screening test that was administered at the Academy on or about May 21, 2009.  Plaintiff's Declaration [37], ¶7. Detective Cain and plaintiff had no interactions at that time (id., ¶10).  However, she states that "[w]hen I was leaving the physical fitness test, I found some roses on my motorcycle. At the time, I did not know who left the roses and was riding my motorcycle, so I left them on a car. I did not recognize the car that I left the roses on, but I later learned that it was [Detective] Cain's car" (id., ¶9).

## The Questionnaire

Upon successfully passing the physical fitness screening test, plaintiff was required to complete a background investigation questionnaire ("questionnaire"), which she submitted on May 27, 2009, and was forwarded as a matter of course to the NFPD's Office of Professional Services ("OPS") for further investigation by Detective Shawn Bosi.  Defendants' Amended Statement of Undisputed Facts [29], ¶¶8-9.

The questionnaire included directions that all answers were subject to polygraph verification and that "[o]mitting information or giving false information may result in rejection of your application and/or removal . . . from consideration for possible appointment" [28-1], p. 4

of 47, Bates No. 000123.  Among the information requested in the questionnaire, plaintiff was

directed to identify all of her arrests and convictions for any violation of the law.  In response,

plaintiff identified a 2004 DWI charge and several vehicle and traffic violations, including in

2001 "passenger seat belt, parking, fine" (id., p. 9 of 47, ¶1, Bates No. 000128; p. 28 of 47,

Bates No. 000147).

        Plaintiff was also directed to identify all "contact you have had with a law

enforcement agency", including "incidents where you were questioned, and incidents where you

were a victim or witness to an incident or crime" (id., p. 11 of 47, ¶7,  Bates No. 000130).  She

responded with the following incidents:

- "Filed a report for being hit by an ex" (id.);
- "Filed a report for being hit by a male on 3rd St." (id.);
- "Filed a report for my car being broken into" (id.);
- "Witnessed a resident jump out of a window @ Niagara Geriatrics" (id.); and
- "08' Small claims court" (id., p. 28 of 47, Bates No. 000147).

The questionnaire further asked whether plaintiff had "ever been called, summoned or

subpoenaed to appear as a witness, or in any other capacity" (id.).  In response, she stated "07' –

court house on 3rd St." (id., p. 11 of 47, ¶6, Bates No. 000130).

        Upon the completion of his investigation, Detective Bosi issued a supplemental

background investigation report dated June 24, 2009, which stated that plaintiff was

"recommended by all references and appears suitable for hire".  Defendants' Amended

Statement of Undisputed Facts [29], ¶9; [28-1], pp. 40-42 of 47, Bates No. 000083-85.


**Candidate Interview**

        On July 14, 2009, John Chella, the NFPD Superintendent, John DeMarco,

Administrative Captain,  and Detective Cain interviewed plaintiff.  Id., ¶11; Cain  Declaration

[22-1], ¶3.  Although the Police Candidate Interview sheet prepared by Superintendent Chella states that plaintiff "successfully explained her unlawful behavior", it does not indicate what unlawful behavior was discussed.  [28-1], p.  47 of 47, Bates Nos. 000082.   Plaintiff states that "we discussed all of the arrests, convictions and police contact listed in my Questionnaire, including  . . . a 2001 seat belt violation and a  2007 incident on Third Street . . . when I was involved in an altercation".  Plaintiff's Declaration [37], ¶23.   However, Superintendent Chella testified that he did not recall discussing either incident with plaintiff, but conceded that it was possible that they discussed the 2001 seat belt violation and that it was also possible that incidents, other than those set forth on questionnaire, were discussed during the interview. Chella deposition transcript [38-1], pp. 28-30 of 86.

Following that interview, Superintendent Chella noted "recommend her for hire + see no reason for either being deferred or disqualified".  [28-1], p. 47 of 47, Bates No.  000082. Plaintiff's employment package was then submitted to Dr. Michael Moses for a psychological evaluation.  Chella Declaration [28], ¶21.

### Questions Arise Concerning  Plaintiff's Veracity

Superintendent Chella states that shortly after the July 14, 2009 interview, he received information from NFPD officers that cast doubt on the information plaintiff provided in the questionnaire and interview.  Chella Declaration [28], ¶22.  Specifically, he points to a conversation that he had with Detective Patricia McCune, who shared her encounters with plaintiff and noted that Officer Christina Zell had similar concerns (id., ¶23).   Both Superintendent Chella and Detective McCune state that their conversation occurred prior to August 12, 2009.  Chella deposition transcript [41-1], p. 9 of 10; McCune Declaration [22-2], ¶5.

Detective McCune's contacts with plaintiff included her refusing Detective McCune's request in January 2008 to come to the station for questioning about an investigation into her allegedly keying a vehicle, and in September 2009 questioning her about a suspected larceny (id., ¶¶6-11). Plaintiff disputes that she was asked to come to the station for questioning concerning the keying incident, and did not understand from Detective McCune's questioning that she was a suspect in that incident. Plaintiff's Declaration [37], ¶74. With respect to the larceny investigation, plaintiff testified that Detective McCune never made her understand that she was a suspect (id., ¶72).

Superintendent Chella states that some time prior to August 12, 2009, he also learned that Detective Bosi failed to include a local police agency check of plaintiff as part of his supplemental background investigation report. Chella Declaration [28], ¶24. At Superintendent Chella's direction, that check was performed by Officer Michael Corcoran (id., ¶25), but Superintendent Chella testified that he did not know when he requested the check to be performed. Chella deposition transcript [38-1], p. 43 of 86. While that check was being performed, plaintiff's candidacy continued to move forward. Chella Declaration [28], ¶26.

Detective Cain also allegedly developed concerns about plaintiff, stating that "[b]y early August 2009, I became aware of rumors within the NFPD that plaintiff had not disclosed a number of prior law enforcement encounters that she had not previously disclosed during her background investigation" and had a conversation with Officer Zell, who "expressed shock that plaintiff was a candidate". Cain Declaration [22-1], ¶13. He testified that Officer Zell was "sitting in front of the police computer, types [plaintiff's] name in and things came up. And I said; woo, I think Administration needs to know about this. And . . . I . . . went upstairs and

told Captain DeMarco".  Cain deposition transcript [38-3], p. 7 of 61.  Detective Cain testified

that the information Officer Zell brought up on the computer related to a January 2008 alleged

larceny (id., pp. 54-55 of 61; [28-5], pp. 14-15, Bates Nos. 00088-89).  Although Detective Cain

could not initially recall when this conversation occurred (id., p. 28 of 61), he later testified that

it occurred prior to plaintiff's August 12, 2009 complaint (id., pp. 60-61 of 61).

### Plaintiff's Conditional Offer of Employment

Plaintiff states that shortly after the July 14, 2009 interview,  she received a

conditional offer of employment from the NFPD, and that Detective Cain then "offered me the

position, even though I had already received an offer from the NFPD".   Plaintiff's Declaration

[37], ¶27. When plaintiff told him that she had already been offered the position,  Detective

"Cain acted like it was his job to make me the offer", and "continued by telling me that he was

more than willing to help me through the hiring process and that I should let him know if I

needed anything" (id.).   Curiously, however, plaintiff  was unable to identify the alleged call

from Detective Cain on her telephone records.  Plaintiff's deposition transcript [37-3], pp. 86-87

of 91.  Detective Cain also denies that this occurred, or that he had any "role in deciding who

would be selected for employment as an entry-level police officer". Cain Declaration [22-1], ¶3;

Cain deposition transcript [38-3], p. 13 of 61.

### The Contacts Between Detective Cain and Plaintiff

Detective Cain  states that "[i]t was not unusual for me to serve as a resource for

all candidates  . . . who reached out to me for tips on how to successfully navigate the entry-level

police officer screening process", and that sometime during the week following the  July 14,

2009 interview, plaintiff contacted him at the Academy to discuss her candidacy. Cain Declaration [22-1], ¶¶5-6. From that point until August 13, 2009, plaintiff and Detective Cain exchanged 374 text messages and plaintiff initiated telephone calls to Detective Cain on July 20, 21, 22, 28, 30, and August 3 and 13, 2009. [23-2], pp. 20-123 of 123; plaintiff's deposition transcript [23-1], pp. 85-93 of 96.

While Detective Cain concedes that their communications were "flirtatious at various points" and that they even discussed dating, he states that they "agreed to keep the relationship professional". Cain Declaration [22-1], ¶8; Cain deposition transcript [38-3], p. 23 of 61. Plaintiff paints a different picture of their interactions. She concedes that some of Detective Cain's communications were appropriate, but others were "very unprofessional", which made her "uncomfortable", including his requests to go for motorcycle rides and "to go for a Pepsi". Plaintiff's Declaration [37], ¶¶30, 32, 33. She also states that he told her that he "had plans to trade his black motorcycle helmet for a white one", which she took to mean that "he wanted to date a white woman" (id., ¶34). According to plaintiff, she "asked [Detective] Cain several times to keep things on a professional level" (id., ¶30).

On or about July 20, 2009, plaintiff went to the Niagara Falls Memorial Medical Center to complete a medical examination as part of the hiring process and ran into Detective Cain. Plaintiff states that he gave her a single rose during this encounter, which made her feel "extremely uncomfortable" (plaintiff's Declaration [37], ¶29),[2] but Detective Cain denies doing so. [38-3], pp. 14-15 of 61.

---

[2] In an August 18, 2009 sworn statement, plaintiff described the July 20, 2009 encounter as follows: "I ran into him outside of the hospital and pulled over my car to talk. He gave me a rose and said he was 'giving it back' to me and to give it to my daughter, who was in the back seat of the car." [28-4], p. 13 of 23, Bates No. 000031.

Plaintiff text messaged Detective Cain on August 7, 2009 that she would be at Shorty's Sports Bar and Grill.  Plaintiff's August 18, 2009 sworn statement [28-4], p. 13 of 23; Cain Declaration [22-1], ¶9.  She explains that she did so because Detective Cain "was always saying I owed him a Pepsi.  I think he thought I owed him for helping me through the hiring process". Plaintiff's August 18, 2009 sworn statement [28-4], p. 13 of 23.  However, after she sent the message, she felt like she "shouldn't have", so she texted Detective Cain that she had left without meeting  him (id.).

Plaintiff states that since Detective Cain "kept pressuring" her to meet him in person, she met him on August 9, 2009 at a Dairy Queen.  Plaintiff's Declaration [37], ¶36. Although she believed that they were going to "discuss the hiring process and upcoming psychological examination", he "did not talk about the NFPD hiring process or psychological examination.  Instead, [Detective] Cain kept asking me personal questions, which I tried to avoid . . . . I did not discuss any concerns that I had with [Detective] Cain about my background during this meeting . . . . [Detective] Cain mentioned to me that he did not think that he could not get into trouble at the NFPD because [Superintendent] Chella was afraid that [Detective] Cain would play the race card. That reinforced the concern I had for my situation and I really began to feel trapped and that my candidacy was destined to fail. This meeting lasted approximately

twenty . . . minutes. When I left, [Detective] Cain insisted on giving me a hug, which made me very uncomfortable and which I felt was very inappropriate" (id.).[3]

Detective Cain provides a very different version of events, stating that during this encounter, plaintiff "expressed concerns about rumors she had heard, including rumors about another female candidate for police officer . . . whom [plaintiff] had heard failed a polygraph examination and was removed from the list." Cain Declaration [22-1], ¶11.  He states that plaintiff discussed feeling suicidal during this encounter and that he subsequently called Superintendent Chella about this conversation, but Superintendent Chella did not express to him any concerns about her candidacy.  Cain deposition testimony [38-3], pp. 34-37 of 61.

Detective Cain states that since plaintiff "seemed discouraged" when they met at Dairy Queen, he sent her a half dozen pink roses on August 11, 2009 for her birthday.  Cain Declaration [22-1], ¶12; [38-6].   The card accompanying the flowers read: "I hope that you enjoy this day as much as I did on the 9th".  Plaintiff's Declaration [37], ¶39.   Plaintiff states that "sending flowers to me really represented a turning point for me in that I felt that I needed to some something to address his relentless attempts to have a romantic relationship with me".

---

[3]      This is a very different account from the one plaintiff provided in her August 18, 2009 sworn statement: "He asked me to meet him at . . . Dairy Queen . . . to discuss the psychological test with Dr. Moses.  He told me that he gave the background packages to Dr. Moses and if he had any concerns, he would tell Dr. Moses to question me about it.  He told me he would tell me what the questions would be, but I told him I didn't want to know. He told me some of the things that the doctor might ask and do, and told me to just be myself and be on time. We also talked about the polygraph that day.  He said it would be a series of questions from the background questionnaire and any concerns that came up at the interview.  I told him I heard that a girl named Shannon Doyle had failed the polygraph, but it was a political thing.  Someone made accusations that she was a stripper, and that's why she wasn't hired.  He said that she didn't fail her polygraph and it was a political thing . . . . I told him I was worried that because I was an attractive female, someone could start rumors about me, and jeopardize my job.  We talked about his daughter who was enrolling in NCCC and her teachers and classes, and I offered to help her out if she needed anything.  At the end of the meeting we hugged good-bye." [28-4], pp. 13-14 of 23, Bates Nos. 000031-32.

Plaintiff's Declaration [37], ¶41.  Detective Cain acknowledges that plaintiff  "made it known

she wasn't happy with the flowers".  Cain deposition transcript [38-3], p. 26 of 61.

On August 12, 2009 at 2:59 p.m., Detective Cain texted the following message to

plaintiff:

> "Hey rude ruby talk around dept. about some things found out about u that's not n
> ur bkgrnd. If I get chance will call u later n exp. no big deal" [45-4], p. 3 of 4.[4]

Plaintiff responded:

> "ok so here we go with the bullshit I'm almost thinking about saying f*** it. Im
> about to reach my boiling point with the cop drama.  Honestly, I don't have time
> in my life for he said she said. I'm looking for a career not a play ground" (id., p.
> 4 of 4).

At 3:07 p.m. Detective Cain replied:

> "Pls don't give up I think u got much 2 offer, but I got call from chief admin ask n
> bout it but . . .  its cop/s start n it" [45-7], p. 1 of 4.

### Plaintiff's Complaint

Within a few hours of Detective Cain's August 12, 2009 text message to plaintiff

informing her that questions had arisen about her background,  Joseph Quigliano, a friend of

plaintiff who was present when Detective Cain's flower delivery arrived, contacted  Detective

Bosi to inform him that plaintiff was being harassed by Detective Cain.  Detective Bosi

immediately relayed this information to Superintendent Chella, who, with Lieutenant Angela

Munn, interviewed  plaintiff on August 17, 2009.  Chella Declaration [28], ¶¶27-30; [28-2], p. 2

of 2; plaintiff's Declaration [37], ¶44.  During that interview, plaintiff states that she discussed

---

[4]      When asked why he would tell plaintiff  that the background concerns were not a big deal despite
believing that his concerns were significant enough to bring them to Captain DeMarco's attention, he
testified "I would only assume that I would do that because I'm not going to play my hand and tell her
exactly what's going on.  Like I don't know what they would be doing with that information.  I'm not
going to say; you need to run and hide." Cain deposition transcript [38-3], p. 59 of 61.

the fact that Detective Cain had stated that there were rumors about her background and candidacy, but Superintendent Chella  her background or candidacy during the interview. Plaintiff's Declaration [37], ¶44.

On August 18, 2009, plaintiff completed a sworn statement outlining Detective Cain's alleged harassing conduct (id., ¶33; [28-4]).  Shortly thereafter, Detective Cain was presented with an Officer Complaint Report, but he denied plaintiff's allegations.  Chella Declaration [28], ¶34-35; [38-8].  Superintendent Chella states that while he did not believe that Detective Cain had sexually harassed plaintiff, it was his opinion that he compromised his position as Co-Director of the Academy, and that rather than going through the time and expense of a formal disciplinary proceeding, the matter could be addressed through verbal counseling and a re-assignment of  Detective Cain.  Chella Declaration [28], ¶¶36-38.

Plaintiff continued with the hiring process, undergoing a polygraph examination, on or about September 15, 2009, which all candidates must successfully complete in order to be eligible for hire.  Chella Declaration [28], ¶¶39-41.   Plaintiff's September 15, 2009 polygraph report concluded that a "slight psychophysiological response indicative of deceptive behavior was observed to the question about other undetected crimes" [28-4], pp. 22-23 of 23, Bates Nos. 000236-237.  However, in a section entitled Post Test, the polygraph report stated:  "I asked [plaintiff] why she would have any reaction to the question about undetected crime.  She became teary eyed when she explained that at about the age of 7 years old, while her mother was having sex with a man for money she went into the man's pants and stole money" (id., p. 23 of 23, Bates No. 000237).

**Officer Corcoran's September 21, 2009 Supplemental Background Investigation**

A supplemental background investigation report was completed by Officer Corcoran on September 21, 2009, which identified a number of incidents involving plaintiff, including:

- On September 14, 2001 "issued traffic citations for no seatbelt and unlawfully disposing of a traffic ticket during a traffic stop", and on December 28, 2001 "arrested for a v&t warrant for . . . [the] incident that occurred on September 14, 2001" [28-5], p. 3 of 54, Bates No. 000087;

- On August 22, 2007 "suspect in a bar fight . . . . charged with harassment for this case", and September 21, 2007 "arrested for harassment concerning an incident that occurred on 8-22-07" (id.);

- On December 8, 2007 "listed as a suspect on a criminal mischief to a vehicle at 1000 Portage Rd" (id.); and

- On January 20, 2008 "listed as a suspect of a larceny at 9807 Porter Rd." (id.).

**Termination of Plaintiff's Candidacy**

Superintendent Chella consulted with Captain DeMarco about plaintiff's candidacy (DeMarco deposition testimony [23-2], pp. 10-11 of 123), but without consulting or receiving any input from Detective Cain, he decided to attempt to terminate plaintiff's candidacy "[b]ased upon [her] unfavorable polygraph examination, the reports . . . received from . . . [Detective] McCune and . . . [Officer] Zell, and the discovery of several of [plaintiff's] undisclosed contacts with local law enforcement". Chella Declaration [28], ¶¶49-50. Superintendent Chella states that "[a]mong other things, [Officer Corcoran's supplemental background investigation report] indicated that that [plaintiff] was a suspect in the alleged commission of a grand larceny in December, 2007, was issued an appearance ticket for a violation of 2nd Degree Harassment in August of 2007 (for which she failed to appear), and was

arrested on a vehicle and traffic warrant in December of 2001.  I also became aware of an incident in which [plaintiff] was listed as suspect on a criminal mischief to a vehicle in January 2008." Chella Declaration [28], ¶46.  Both Superintendent Chella and Captain DeMarco testified that it was plaintiff's failure to disclose these incidents, rather than the incidents themselves, that led to the decision to terminate her candidacy.  Chella deposition transcript [38-1], p. 64 of 86; DeMarco deposition transcript [23-2], p. 9 of 123.

After being notified by Superintendent Chella that he believed that plaintiff should be disqualified for failing to divulge the necessary information concerning her criminal history on her Questionnaire or during her interview, the Niagara Falls Municipal Civil Service Commission voted unanimously to remove her name from the Civil Service candidates list. Chella Declaration [28], ¶¶51-54.   After hearing from plaintiff, the Civil Service Commission unanimously denied her appeal in November 2009.  Chella Declaration [28], ¶¶54-58;  [28-5], pp. 49-50, 52 of 54. The minutes from the Civil Service Commission meetings reflect that the only two incidents that were discussed were plaintiff's arrest in 2001 on a vehicle and traffic warrant and 2007 arrest for harassment.  [28-5], pp. 49-50, 52 of 54, Bates Nos. D000342-44.

**Detective Cain's Reassignment**

Although Captain DeMarco could not recall when it occurred, he had an informal meeting with Detective Cain to discuss plaintiff's allegations.  DeMarco deposition transcript [23-2], p. 14 of 123.  He advised Detective Cain that "if there was any truth to the allegations . . . this was extremely unprofessional on his part and he placed himself and the Department in great jeopardy" (id., p. 15 of 123).  Captain DeMarco characterized their discussion as unofficial and not rising to the level of a reprimand (id., p. 17 of 123).  No formal

disciplinary action was taken against Detective Cain (id., p. 18 of 123).  Although Detective Cain was reassigned from his position at the Academy effective November 16, 2009, Captain DeMarco testified that it was informal discipline (id., p.19 of 123; [28-4], p. 18 of 23, Bates No. 000171).

Superintendent Chella  testified that after the investigation, he felt that Detective Cain had violated the rules of conduct set forth in the Officer Complaint Report filed against him.  Chella's deposition transcript [38-1], p. 83 of 86; Officer Complaint Report [38-8], p. 2 of 4.  He further testified that a Form 16 is used by the NFPD for discipline and while the use of an Officer Complaint Report was a "deviation from the standardized form",  it contained "all the same information that a 16 would".  Chella's deposition transcript [38-1], p. 80 of 86.

## ANALYSIS

**A.      Summary Judgment Standard**

"The standards governing summary judgment are well-settled. Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

**B.      Should Any Facts be Deemed Admitted?**

            The parties challenge the sufficiency of each other's statements of fact.  Plaintiff

challenges defendants' Amended Statement of Undisputed Facts [29], arguing that 43 of its

paragraphs "parrot the language found in [Superintendent Chella's Declaration] and do not

contain the required citation to the record", and requests that that "the corresponding assertions

of fact found in [her]  Counter Statement of Undisputed Facts . . .  be deemed admitted".

Plaintiff's Memorandum of Law [40], p. 3.  Defendants fail to respond to that argument.  Instead,

they argue that argue that plaintiff's Counter Statement of  Material Facts [39] responds to their

Statement of Undisputed Facts, rather than their Amended Statement of Undisputed Facts,

resulting in certain facts not being contested.  Defendants' Reply Memorandum of Law [43], pp.

9-10.

            Even if the parties' statements of fact fail to comply with this Court's Local

Rules, "[a] district court has broad discretion to determine whether to overlook a party's failure

to comply with local court rules."  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir.

2001); Pensionsversicherungsanstalt v. Greenblatt, 556 Fed.Appx. 23, 25 (2d Cir. 2014)

(Summary Order) ("nothing requires a district court to deem evidence admitted . . .  simply

because a non-movant fails to comply with local rules").  *See also* Paolercio v. Allstate Insurance

Co., 2011 WL 4628748, *1 (E.D.N.Y. 2011) ("The court endeavors . . . to avoid penalizing

parties harshly as a result of technical errors by their attorneys").  Given the parties' opposing

challenges to the sufficiency of their statements of fact, I decline to deem either parties' facts

admitted.

**C.      Is the NFPD an Entity Subject to Suit?**

Defendants argue that the NFPD must be dismissed since it does not have a legal identity separate and apart from the City.  Defendants' Memorandum of Law [24], pp. 25-26 of 26.  I agree, and recommend that the NFPD be dismissed.  *See* Davis-Payne v. Galie, 2015 WL 2194535, *8 (W.D.N.Y. 2015) (Telesca, J.) (dismissing suit against the NFPD on this ground).

**D.      Sexual Harassment**

Title VII recognizes two forms of sexual harassment: "direct discrimination (the so-called '*quid pro quo'* variety) . . . and 'hostile workplace environment' harassment". Leibovitz v. New York City Transit Authority, 252 F.3d 179, 188 (2d Cir. 2001).  Plaintiff relies on both of these theories of harassment.

**1.      Hostile Work Environment**

In order to establish sexual harassment in violation of Title VII based upon a hostile work environment, a plaintiff must first prove "(1) that she is a member of a protected group; (2) that she was the subject of unwelcome advances; (3) that the harassment was based upon her sex; and (4) that the harassment affected a term, condition or privilege of employment." Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1042 (2d Cir. 1993).   The fourth element requires that "the harassment must be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive working environment." Id.  *See* Szwalla v. Time Warner Cable, LLC,   2015 WL 5708538, *5 (N.D.N.Y.  2015).  "Second, the plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997).  A hostile work environment claim  predicated  on sexual harassment is reviewed according to the

same standard under the NYSHRL.  *See* Pucino v. Verizon Wireless Communications, Inc., 618 F.3d 112, 117 n. 2 (2d Cir. 2010).

"The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998).  That requirement is crucial "to ensure that courts and juries do not mistake ordinary socializing in the workplace - such as  . . .  intersexual flirtation - for discriminatory 'conditions of employment'".  Id.  Defendants argue that Detective Cain's conduct constituted flirting, rather than sexual harassment, and fails to meet the severe and pervasive standard. Defendants' Memorandum of Law [24], p. 5.

"There is no 'mathematically precise test'  . . .  for deciding whether an incident or series of incidents is sufficiently severe or pervasive to alter the conditions of a plaintiff's working environment."  Rasprado v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014) (*quoting* Harris, 510 U.S. at 22–23).   "Instead, courts must assess the totality of the circumstances, considering elements such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' The effect of identified incidents on the employee's psychological well-being is also relevant, though not determinative." Id.  (*quoting* Harris, 510 U.S. at 23). "Facially sex-neutral incidents may be included  among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex." Moll v. Telesector Resource Group, Inc., 760 F.3d 198, 203 (2d Cir. 2014).

"[A] plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions."  Pucino, 618 F.3d at 119 (emphasis in original).  The severe or pervasive standard has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive."  McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 79 (2d Cir. 2010).

The Second Circuit has recognized that "hostile work environment claims present mixed question] of law and fact that are especially well-suited for jury determination", and that "summary judgment is appropriate only where application of the law to those undisputed facts reasonably support only one ultimate conclusion".  Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 605 (2d Cir. 2006).  Nevertheless, "[t]here are, of course, cases in which it is clear . . . that after assessing the frequency of the misbehavior measured in light of its seriousness, the facts cannot, as a matter of law, be the basis of a successful hostile work environment claim", since it remains "the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact and may be appropriate even in the fact-intensive context of discrimination cases".  Id. at 608.

Crediting plaintiff's version of events, the contacts at issue began on or about July 20, 2009, when Detective Cain gave her a single rose.  Plaintiff's Declaration [37], ¶¶28-29. It is undisputed that following that encounter Detective Cain and plaintiff exchanged 374 text messages and spoke on the telephone a number of times from July 21 to August 13, 2009. Brown Declaration [23-2], pp. 20-123 of 123.   During this period, plaintiff states that Detective Cain discussed dating her and asked on "several occasions" for her to go on motorcycle rides and

on a "few occasions" to meet socially. Plaintiff's Declaration [37], ¶¶33, 34.  She also states that he told her that he "had plans to trade his black motorcycle helmet for a white one", which she took to mean that "he wanted to date a white woman" (id., ¶34).  Plaintiff further states that although she asked Detective Cain "several times" to keep things on a professional level, he kept pressuring her to meet him in person, and that when she could avoid him no longer, she met him at Dairy Queen, where he "kept asking [her] personal questions" and hugged her at the end of the encounter (id., ¶¶30, 36).  When Detective Cain then sent her roses on August, 11, 2009 for her birthday, with a card that read "I hope you enjoy this day as much as I did on the 9th", this allegedly represented a "turning point" for plaintiff, in that she felt that she "needed to do something to address his relentless attempts to have a romantic relationship" (id., ¶¶39, 41).

Notwithstanding Detective Cain's alleged pursuit of plaintiff, she concedes that he never propositioned her for sex, touched her inappropriately, promised her any special consideration based upon her willingness to enter into a romantic relationship with him, or threatened her.  Plaintiff's deposition transcript [23-1], pp. 95-96 of 96.  She also conceded in her August 18, 2009 sworn statement that while it "seemed like he was looking for more than a 'recruit/training officer' relationship", she "felt like he wasn't making overt sexual advances". [28-4], p. 14 of 23.

Detective Cain's alleged conduct is no more pervasive or severe than conduct that other courts have found insufficient to establish a hostile work environment.  *See* Vito v. Bausch & Lomb Inc., 403 Fed. App'x 593, 596 (2d Cir. 2010) (Summary Order) ("Though no doubt irritating, inappropriate, and offensive, the harassment Vito alleges is less severe than the overtly sexual conduct that we found insufficient to sustain a hostile work environment in [other cases]").  For example, in Parisi v. Buffalo Municipal Housing Authority,  2003 WL 21382893

(W.D.N.Y. 2003) (Elfvin, J.), the court concluded that the plaintiff had failed to  raise a triable

issue of fact as to whether she suffered an objectively hostile work environment, where her

supervisor  "(1) joked to another employee that he was going to obtain a prescription for Viagra

so he could 'be with [her]', (2) . . .  stood in front of her and blocked her from walking through

an office hallway, (3) . . .  repeatedly asked [her] to go out with him on a date and (4) . . .

whispered in her ear and (5) . . .  repeatedly commented on plaintiff's appearance." Id., *4.  The

court noted that the supervisor's "conduct can best be described as occasional and flirtatious

attempts to win plaintiff's affections". Id.  It concluded that plaintiff had not shown that the

offensive conduct could be considered severe, noting that "[p]laintiff has not alleged, and the

evidence does not show, that [the supervisor] ever physically touched or threatened her, or that

[his] conduct unreasonably interfered with her work performance" or that  "within [the] informal

atmosphere [of that workplace], occurred with a sufficient degree of frequency to be considered

pervasive". Id.

   Similarly, in O'Dell v. Trans World Entertainment Corp., 153 F. Supp. 2d 378,

386 (S.D.N.Y. 2001), aff'd, 40 Fed. App'x 628 (2d Cir. 2002) (Summary Order), the

"[p]laintiff . . .  presented evidence that while Rosen was both a co-employee and her supervisor,

he repeatedly asked her out. Rosen made comments about her appearance, sent her e-mails

professing his love for her, called her at work and at home, invited her to tour New York City

with him, gave her three gifts, and played her a song that she found offensive."  The court held

that this conduct was neither sufficiently pervasive nor  severe to alter the conditions of her

employment, particularly in light of the fact that "plaintiff has not alleged any inappropriate

touching or a pattern of verbal abuse . . . and has not alleged that Rosen engaged in any vulgar

conduct or made any sexually inappropriate comments." Id.  See also Feliciano v. Alpha Sector,

Inc., 2002 WL 1492139, *8 (S.D.N.Y. 2002) (the plaintiff's co-worker's "come-ons" did not

create an objectively hostile work environment where he "complimented her, said he wanted to

date her, attempted to hug her, stated on one occasion that he wanted to 'lay with' [her], and,

after having given her a ride home, kissed her"); McKenna v. VCS Group. LLC,  2009 WL

3193879, *5 (D. Conn. 2009) (dismissing a complaint alleging a hostile work environment claim

pursuant to Fed. R. Civ. P. ("Rule") 12(b)(6) where the plaintiff alleged that on  "'not less than

fifteen (15) occasions'  over the course of her seven months of employment . . . [her supervisor]

'remarked upon McKenna's dress as showing quite a bit of cleavage' [,] 'invited others at

meetings to note that McKenna had large breasts' and that 'McKenna was living with her

mommy and must be desperate for a man' [and] . . . ordered McKenna to complete such tasks as

'clean[ing] out [his] garage at [his] home'");  Guerrero v. Lowe's Home Centers, Inc., 254 F.

App'x 865, 867 (2d Cir. 2007) (Summary Order) ("We think it important . . . that Guerrero

alleges no physical touching or threats, no interference with her work performance, and no overt

sexual advances").

Plaintiff makes no attempt to address, much less distinguish, Parisi.  Nor does she

cite any cases where comparable or less offensive conduct was sufficient to support a hostile

work environment claim.  Indeed, she concedes that "[Detective] Cain's behavior may not have

been severe when compared with other sexual harassment cases involving sexual abuse and

inappropriate touching".  Plaintiff's Memorandum of Law [40], p. 12.

Instead, she argues that the conduct "was certainly pervasive enough to create a

hostile work environment for [her]".  While plaintiff appears to rely on the number of text

messages as establishing the pervasiveness of Detective Cain's alleged conduct over this

approximately three week period (id.), the telephone records ([23-2], pp. 20-123 of 123)

demonstrate that their text messages were far from unilateral, and that she initiated all of the telephone calls with Detective Cain.  Such conduct is also difficult to reconcile with her claim that she subjectively perceived Detective Cain to have created a hostile work environment.

In any event, notwithstanding the frequency of communications between Detective Cain and plaintiff during this approximately three week period and her allegations of having to receive treatment for post traumatic stress disorder (plaintiff's Declaration [40], ¶63), none of his communications were either threatening or derogatory, and there was no physical contact other than one unwelcome hug.  Nor is there evidence that Detective Cain's behavior unreasonably interfered with plaintiff's ability to proceed with the police officer candidate screening process, either during or after her contacts with him. [5]   Therefore, I recommend that plaintiff's hostile work environment claim be dismissed.[6]

###    2.    *Quid Pro Quo* **Harassment**

"To state a *quid pro quo* claim, [a plaintiff] must show a tangible employment action, i.e., that an explicit alteration in the terms or conditions of employment resulted from her refusal to submit to [a supervisor's] sexual advances."  Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 604 (2d Cir. 2006).  Defendants argue in their reply that plaintiff's claim that she was subjected to *quid pro quo* sexual harassment "was never raised before the Equal Employment Opportunity Commission [("EEOC")] or in her Complaint and cannot be raised for

---

[5]    Although not argued by defendants, I also question whether the alleged offending conduct occurred in the workplace, as required for a hostile work environment claim.  *See* Gillman v. Inner City Broad. Corp., 2011 WL 181732, *1 (S.D.N.Y. 2011) ("Because there is no dispute that the alleged incidents did not take place in the 'workplace,' Gillman cannot make out a hostile work environment case").

[6]    Based upon this conclusion, it is unnecessary for me to address defendants' alternative argument that Cain's conduct cannot be imputed to the City.  *See* Defendants' Memorandum of Law [24], pp. 6-10.

the first time in opposition to summary judgment". Defendants' Reply Memorandum of Law [43], p. 2 of 11.

"Hostile environment and *quid pro quo* harassment causes of action are not always clearly distinct and separate." Carrero v. New York City Housing  Authority, 890 F.2d 569, 579 (2d Cir. 1989). While plaintiff does not specifically use the term "*quid pro quo*" in either her Amended Complaint ([1], pp. 23-36 of 40) or her EEOC charge ([23-1], p. 2 of 96), the Second Circuit has rejected "a rigid rule that would require plaintiffs to use the words '*quid pro quo*' or 'hostile work environment'",  since "these terms are judicially created for analytical purposes, not distinctions in the statute itself". Schiano, 445 F.3d at 604. *See* Wei Fu v. ISO Innovative Analytics, 2014 WL 1289235, at *15 n. 12 (D. Conn.  2014).[7]  Instead, the Second Circuit has "look[ed] to the substance of the alleged misconduct of which the plaintiff complains rather than the terms used to describe it. If, for example, a plaintiff were to argue that she had been demoted for refusing to respond positively to her supervisor's sexual overtures  . . . the assertion would preserve her *quid pro quo* claim even if she never used the phrase 'quid pro quo' . . .  to describe it". Schiano, 445 F.3d at 604.

The Amended Complaint does not allege that plaintiff's candidacy was terminated because she refused to submit to Detective Cain's sexual advances, that Detective Cain had any direct role in her termination, or that Detective Cain in any way conditioned any tangible employment action on his sexual advances. Therefore,  I conclude that the Amended

---

[7]      The determination of whether a claim has been sufficiently raised in an EEOC charge is lenient. "A district court may assume jurisdiction . . .  over complaints containing allegations that are 'reasonably related' to the allegations in the EEOC complaint  . . . . A claim of discrimination is reasonably related to a charge filed with the EEOC if: a) a plaintiff presents it to the EEOC; or b) the EEOC investigates the claim; or c) the EEOC investigation of the original charge could be expected to encompass the claim." McKinney v. Eastman Kodak Co., 975 F. Supp. 462, 465 (W.D.N.Y. 1997) (Larimer, J.).

Complaint does not allege a *quid pro quo* claim.  *See* <u>Gillman</u>, 2011 WL 181732, *1, 3 n. 1 (concluding that while the plaintiff alleged a hostile work environment claim, he had not alleged a *quid pro quo* claim).

However, since I acknowledge that this presents a close question, I will analyze defendants' arguments directed at this claim.  Defendants initially argue that Detective Cain did not condition "any employment action on [plaintiff's] willingness to submit to a sexual advance".  Defendants' Reply Memorandum of Law [43], p. 2. I agree with defendants that there is no evidence that Detective Cain threatened plaintiff with an adverse employment action for failing to accede to his advances.

However, even where "direct evidence is lacking, a plaintiff still may survive summary judgment by providing circumstantial proof tha[t] an adverse employment action followed closely in time after the employee rejected or complained about the supervisor's sexual advance. Where a plaintiff relies on evidence of temporal proximity, the case law uniformly holds that the temporal link must be very close." <u>Messer v. Fahnestock & Co. Inc.</u>, 2008 WL 4934608, *15 (E.D.N.Y. 2008). *See* <u>Figueroa v. Johnson</u>,  __ F.Supp.3d__,  2015 WL 2454065, *17 (E.D.N.Y. 2015) ("As in the retaliation context, temporal proximity between the rejection of the sexual advance and the adverse employment action can lead to or combat an inference that the plaintiff was subject to *quid pro quo* sexual harassment").  "While the Second Circuit 'has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship,' <u>Gorman–Bakos v. Cornell Co-op Extension</u>, 252 F.3d 545, 554 (2d Cir.2001), time periods of approximately two months or less generally have been held to be sufficient".  <u>Id</u>.  Here, plaintiff's termination occurred approximately six weeks after her complaint about Detective Cain.

Next, defendants argue that Detective Cain made "no sexual advance toward [plaintiff]". Defendants' Reply Memorandum of Law [43], p. 2. Although they rely on plaintiff's concession in her August 18, 2009 sworn statement that she did not believe that Detective Cain was making any "*overt* sexual advances" ([28-4], p. 15 of 23, emphasis added), that is distinct from a concession that there were no sexual advances whatsoever. Messer , 2008 WL 4934608, *14 ("While overt requests for sexual favors are of course prohibited, so too are implicit sexual pressures and harassing conduct"). Moreover, "'[a] sexual advance . . . might consist of a request to spend the night, have an affair, go skinny dipping, move into an apartment together, *go out for a drink or date after repeated refusals*, "make out" or, in one way or another, have sex." Hine v. Extremity Imaging Partners, Inc., 773 F. Supp. 2d 788, 795 (S.D. Ind. 2011) (emphasis added) (*quoting* 1 Alba Conte, Sexual Harassment in the Workplace, §3.05(B)(1) at 3 - 89 (4th ed. 2010)).

Last, defendants argue that Detective Cain was not plaintiff's supervisor. Defendants' Reply Memorandum of Law [43], p. 2. "Because the *quid pro quo* harasser, by definition, wields the employer's authority to alter the terms and conditions of employment - either actually *or apparently* - the law imposes strict liability on the employer for *quid pro quo* harassment." Karibian v. Columbia University, 14 F.3d 773, 777 (2d Cir. 1994), cert. denied, 512 U.S. 1213 (1994) (emphasis added). Although Detective Cain may not have been plaintiff's actual supervisor, the record demonstrates that there are triable issues of fact as to whether he held himself out to plaintiff as having that authority. *See* DeWitt v. Lieberman, 48 F. Supp. 2d 280, 289 (S.D.N.Y. 1999) ( issues of fact existed as to whether the plaintiff  was reasonable in believing that her supervisor had the apparent authority to alter the terms and conditions of her

employment, thereby precluding summary judgment in favor of defendant quid pro quo sexual harassment claim).

Therefore, if my conclusion that plaintiff's Complaint did not allege a claim for *quid pro quo* harassment is determined to be erroneous, I would recommend that defendants' motion for dismissal of this claim be denied.

**E.  Retaliation**

Title VII prohibits employers from retaliating "against any . . .  employee[ ] or applicant[] for employment . . . because he has opposed any practice made unlawful" by Title VII. 42 U.S.C. § 2000e–3(a).  "Claims of retaliation under Title VII and the NYHRL are governed by the burden-shifting analysis announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 . . . (1973)." Seale v. Madison County, 2015 WL 667531, *14 (N.D.N.Y  2015).

"Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation by offering evidence that she participated in a protected activity, suffered an adverse employment action, and that there was a causal connection between her engaging in the protected activity and the adverse employment action.  This showing creates a presumption of retaliation, which the defendant may rebut by articulating a legitimate, non-retaliatory reason for the adverse employment action.  If the defendant provides such an explanation, the presumption of retaliation dissipates, and the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action.'" Ya-Chen Chen v. City University of

New York, 805 F.3d 59, 70 (2d Cir. 2015) (*quoting* University of Texas Southwestern Medical

Center v. Nassar, __U.S. __, 133 S.Ct. 2517, 2528 (2013)).[8]

       "[B]ut-for" causation does not require proof that retaliation was the only cause of

the employer's action, but only that the adverse action would not have occurred in the absence of

the retaliatory motive.  A plaintiff may prove that retaliation was a but-for cause of an adverse

employment action by demonstrating weaknesses, implausibilities, inconsistencies, or

contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Zann

Kwan, 737 F.3d at  846.  "[T]he but-for causation standard does not alter the plaintiff's ability to

demonstrate causation at the prima facie stage on summary judgment or at trial indirectly

through temporal proximity." Id. at 845.

       First, defendants note that  "[e]mployers need not suspend previously planned

[employment actions]  upon discovering that a [discrimination complaint] has been filed, and

their proceeding along lines previously contemplated, though not yet definitively determined, is

no evidence whatever of causality."  Clark County School District v. Breeden, 532 U.S. 268, 272

(2001). *See also* Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001),

cert. denied, 534 U.S. 951 (2001) ("Where timing is the only basis for a claim of retaliation, and

gradual adverse job actions began well before the plaintiff had ever engaged in any protected

activity, an inference of retaliation does not arise").  They argue that since "the suspicions about

[plaintiff's] prior law enforcement encounters – *and the City's process of looking further into her*

---

[8]      "Although it is not yet clear whether the 'but-for' standard applies to NYSHRL claims or whether
Plaintiff need only 'demonstrate that a retaliatory motive was a substantial or motivating factor behind the
adverse action,' the Court need not address which standard applies because on this record, the distinction
does not alter the Court's conclusions." Henry v. Metro. Transportation Authority, 2014 WL 4783014,
*18 (S.D.N.Y. 2014) (*quoting*  Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 846 n. 5, 847 n. 7 (2d
Cir. 2013)).

*background* – started well before the City had notice of harassment complaint against [Detective] Cain, it cannot support an actionable retaliation claim". Defendants' Memorandum of Law [24], p. 13 (emphasis added).

While the record demonstrates that Superintendent Chella was alerted to plaintiff's non-disclosure of certain law enforcement contacts prior to her complaint about Detective Cain, it fails to establish whether the process of looking into her background (*i.e.*, requesting that a supplemental background check be conducted) preceded plaintiff's complaint. Significantly, Superintendent Chella conceded that he did not know when he requested Officer Corcoran's supplemental background investigation report. Chella deposition transcript [38-1], p. 43 of 86. Suggesting that it was not requested until sometime shortly before its completion on September 21, 2009, Superintendent Chella testified that performing the database check is "[g]enerally . . . quite rapid", and that while it may take longer if obtaining court documents was necessary, he was unaware of any records that Officer Corcoran had to obtain for plaintiff's background check (id., pp. 44-45 of 86). Thus, there are triable issues of fact as to whether Superintendent Chella planned to undertake any efforts to investigate plaintiff's background prior to her complaint about Detective Cain. *See* Hexemer v. General Electric Co., 2015 WL 3948418, *8 (N.D.N.Y. 2015) ("[A]lthough it is possible for a rational factfinder to find that Plaintiff's termination at the end of October was part of a plan by GID that predated Plaintiff's protected activity, a factfinder could also reasonably conclude that Plaintiff's termination within a week of her protected activity was motivated by retaliatory animus").

Next, defendants argue that plaintiff "has no evidence to establish circumstances giving rise to an inference of . . . retaliation or otherwise overcome the City's legitimate, non-discriminatory reasons for removing her from the eligible list". Defendants' Memorandum of

Law [24], p. 13. I disagree.  Both Superintendent Chella and Captain DeMarco conceded that it was plaintiff's failure to disclose all of her law enforcement contacts in her Questionnaire, rather than the incidents themselves, that led to the termination of her candidacy.  Chella deposition transcript [38-1], p. 64 of 86; DeMarco deposition transcript [23-2], p. 9 of 123.  If the investigation into plaintiff's background was not requested by Superintendent Chella until after plaintiff's August 12, 2009 complaint about Detective Cain, giving plaintiff the benefit of every favorable inference (as I must for purposes of this motion), this suggests that Superintendent Chella's concerns about plaintiff's veracity on her questionnaire only began to have a possible affect on her candidacy after her complaint.  Had Superintendent Chella believed that this was a significant issue bearing upon plaintiff's candidacy as he alleges, there would have been no reason for him to delay in requesting the supplemental background check after learning from Detective McCune that plaintiff was not forthright on her questionnaire.  Nor was there anything precluding a prompt resolution to this issue based upon Superintendent Chella's acknowledgement that any police officer would have had access to the databases that Officer Corcoran used in preparing his supplemental background report.  Chella deposition testimony [38-1], p. 43 of 86.

Superintendent Chella further testified that if he had Officer Corcoran's supplemental background report at that time of plaintiff's interview, it would have merely facilitated a discussion of those incidents.  Chella deposition testimony [38-1], pp. 66-67 of 86. Inexplicably, however, he did not have a discussion with plaintiff about the incidents when he later received the report.  Instead, he promptly attempted to end her candidacy.

For purposes of this motion, I must also credit plaintiff's testimony that her 2001 arrest on a vehicle and traffic warrant and appearance ticket for harassment in August 2007 were

discussed at her July 14, 2009 interview.  Had plaintiff discussed these incidents at her interview,

Superintendent Chella's and Captain DeMarco's representations to the Civil Service

Commission that she failed to disclose these incidents would strongly impugn the alleged non-

retaliatory motivation for the termination of her candidacy.  Defendants attempt to argue that

even if  Superintendent Chella was under a mistaken belief as to what was discussed during

plaintiff's interview, it would not establish a factual dispute as to pretext.  Defendants'

Memorandum of Law [24], p. 16.  However, giving plaintiff the benefit of every favorable

inference, I am unable to conclude that this was merely the result of a mistake.

Moreover, while these were only two of the four undisclosed incidents

Superintendent Chella points to as prompting his decision to terminate plaintiff's candidacy, the

minutes of the Civil Service Commission meetings establish that these were the only two

incidents that the NFPD relied upon in seeking her termination.  [28-5], pp. 49-50, 52 of 54,

Bates Nos. D000342-44.  Defendants attempt to minimize the significance of this by noting that

the minutes would not reflect everything that was discussed, but fail to offer any affirmative

evidence that these other incidents were discussed.  *See* Zann Kwan, 737 F.3d at 847 ("[W]hile

Kwan's poor performance on the Argentina and Mexico projects became critical parts of

Andalex's argument that Kwan had performed poorly, those projects were never even mentioned

to the EEOC as reasons for Kwan's termination. From such discrepancies a reasonable juror

could infer that the explanations given  . . .  were pretextual").

Although Superintendent Chella states that it was "the totality of the

circumstances"  that led to his decision to seek to terminate plaintiff's candidacy (Chella

Declaration [28], ¶49), he acknowledged at his deposition that any and all concerns he had with

plaintiff's candidacy were solely the result of the supplemental background investigation.  Chella

-30-

deposition testimony [38-1], p. 117.   Further, while he specifically points to the results of the polygraph examination as factoring into his decision to seek to terminate plaintiff's candidacy (Chella Declaration [28], ¶49), he testified that he could not recall whether he was concerned with the polygraph report's determination that plaintiff's psychophysiological response was indicative of deceptive behavior.   Chella's deposition transcript [38-1], p. 78.

I am mindful that if "[t]he defendant considered the action to be serious enough to warrant termination of her employment  . . .  it is not for courts to determine the wisdom of an employment action, but instead to determine whether or not that action was motivated by . . . retaliation".  Fairbrother v. Donahoe,  2014 WL 4685298,  *8 (W.D.N.Y. 2014) (Telesca, J.). However, given the various contradictions in defendants' proffered legitimate, nonretaliatory reasons for terminating plaintiff's candidacy, and particularly mindful that  "[r]equiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden to show that such consideration was the 'sole' cause" (Zann Kwan, 737 F.3d at 854 n. 5), I conclude that plaintiff has raised a triable issue of fact as to whether their  reasons were pretextual.  As the Second Circuit recently recognized, "[t]he determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact".  Id.  Therefore, I recommend that this portion of defendants' motion be denied.

## CONCLUSION

For these reasons, I recommend that defendants' motion for summary judgment [22] be denied to the extent that it seeks dismissal of plaintiff's Title VII and NYSHRL retaliation claim against the City, but otherwise be granted.

-31-

Unless otherwise ordered by Judge Skretny, any objections to this Report and Recommendation must be filed with the clerk of this court by February 29, 2016 (applying the time frames set forth Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Skretny. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated:  February 12, 2016

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge